AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Felipe de Jesus Ornelas Mora | ) | Case No. |
| | ) | 4:22-mj-71160-MAG |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**FILED**

Sep 01 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Dec. 2, 2020 to June 16, 2022___ in the county of ___Alameda___ in the ___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Monetary Instruments |
| | Maximum Penalties: 20 years' imprisonment; $500,000 fine or twice the amount involved in the offense; 3 years supervised release |

This criminal complaint is based on these facts:

See attached affidavit of IRS-CI Special Agent Lisa Sasso

☑ Continued on the attached sheet.

Approved as to form  _/s/ Daniel Pastor_
        AUSA _Daniel Pastor_

Sworn to before me by telephone.

/s/ Lisa Sasso
*Complainant's signature*

Lisa Sasso, IRS-CI Special Agent
*Printed name and title*

Date:        08/31/2022

*Judge's signature*

City and state:        Oakland, California

Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF IRS SPECIAL AGENT LISA SASSO
IN SUPPORT OF CRIMINAL COMPLAINT**

I, Lisa Sasso, Special Agent of the Internal Revenue Service – Criminal Investigations, being duly sworn, hereby state as follows:

**<u>INTRODUCTION</u>**

1.      I make this affidavit in support of a criminal complaint against **Felipe de Jesus Ornelas Mora (FELIPE)**, for violation of 18 U.S.C. § 1956(h), conspiracy to launder monetary instruments.  **FELIPE** is the owner of Rincon Musical, LLC ("Rincon"), a money transmitter business located in Oakland, California.

2.      **Veronica Mora (VERONICA)** and **Yoselin Perez Ramirez (YOSELIN)** are cashiers at Rincon. **Griselda Cancelada Liceaga (GRISELDA)** is a former cashier at Rincon and now owns America Latina, a money transmitter business in Oakland, California. **VERONICA**, **YOSELIN**, **and GRISELDA** have been charged with conspiracy to launder monetary instruments and knowing use of another person's identification documents with the intent to commit, or to aid and abet, unlawful activity, in Case No. 4:22-mj-71156-MAG.

3.      I have personally participated in the investigation discussed in this affidavit.  I am familiar with the facts and circumstances of the investigation through my personal participation, through information I learned from fellow law enforcement officers, and through my review of reports and other documents.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a federal agent or task force officer, law enforcement officer, or witness who had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed.  Such statements made by others and are stated in substance and in part unless otherwise indicated.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the complaint against **Felipe Jesus de Ornelas Mora**, I have not included every fact known to me about this case.

## AGENT BACKGROUND

4.      I am a Special Agent of the United States Department of the Treasury, IRS-CI, and have been so employed since October 1999.  I am currently assigned to the Oakland Field Office, and I am trained and authorized to investigate the offenses alleged herein.  During my employment with IRS-CI, I have personally conducted criminal investigations involving violations of the internal revenue laws, money laundering violations, and related financial crimes.  I have participated in the execution of at least 80 federal search warrants related to the above-mentioned investigations.  Additionally, I have personally been the affiant for at least 15 search and seizure warrants in connection with those crimes.

5.      My professional and academic training includes over six months of training at the Federal Law Enforcement Training Center in Glynco, GA, where I completed the Special Agent Basic Training Program.  This training included courses in conducting criminal investigations, federal criminal statutes, financial analysis, and the law of search and seizure under the Fourth Amendment of the United States.  I also have attended multiple specialized seminars with a focus on money laundering and the financial aspects relative to narcotics investigations.  Prior to being a Special Agent, I was an IRS Revenue Agent for four and a half years.  As a Revenue Agent, I examined tax returns to determine compliance with internal revenue laws.

6.      Over the course of my career as an IRS Special Agent I have been lead investigator on over 25 criminal investigations.  These investigations involved investigating alleged violations of internal revenue laws, money laundering statutes, bank secrecy act statutes, and identity theft statutes.  During such investigations, I have conducted interviews of arrested persons, debriefed confidential sources, led undercover operations, conducted physical surveillance, conducted over 100 witness interviews, executed search and seizure warrants, and prepared investigations for prosecution.

7.      I have been the lead IRS-CI Agent in multiple Organized Crime Drug Enforcement Task Force (OCDETF) investigations.  OCDETF is a task force comprised of

multiple law enforcement agencies which jointly investigate drug trafficking organizations involved in the manufacture, distribution, and possession of various controlled substances including marijuana, cocaine, methamphetamine, heroin, 3,4 methylenedioxymethamphetamine (MDMA), alprazolam, steroids, and oxycodone among others.  I have analyzed financial records and other information relating to violations of money laundering statutes (Title 18, United States Code) and Bank Secrecy Act (Title 31, United States Code) committed by various drug trafficking organizations.

8.     Based on my training and experience, as well as my consultations with other Special Agents with whom I work, I am familiar with the methods and practices used by individuals and organizations involved in financial crimes and illicit activities that generate large amounts of income. The methods and schemes used by these individuals to dispose of the proceeds of illicit activities are collectively called money laundering.  These methods include cash purchases, conducting cash transactions in amounts less than $10,000 to avoid reporting requirements, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities, the use of wire remitter companies to convert currency into wire transfers below reporting requirements, the use of money orders and cashier's checks to avoid depositing currency into bank accounts, structuring transactions to avoid currency reporting forms, the use of "off-shore" banking in an attempt to break the paper trail, the use of bank safe deposit boxes to conceal and secure their proceeds, and the use of virtual currencies to attempt to conceal their true identities and avoid a paper trail of transactions, to name a few of the methods.

9.     From my knowledge, training and experience I know that narcotics traffickers also commonly utilize the services of money transmitter businesses to transfer their illicit proceeds.

10.     Money transmitters allow individuals to convert cash into electronic wire transfers to avoid depositing currency into bank accounts.  The use of money transmitters is particularly attractive to individuals engaged in interstate drug trafficking as it allows the distributors of

3

drugs in various regions of the United States to quickly pay an international or an out-of-state supplier without having to move bulk cash by vehicle and risk bulk cash being seized by law enforcement.

## APPLICABLE LAW

9.     Pursuant to 18 U.S.C. § 1956(a)(1)(B) (money laundering), it is unlawful to knowingly conduct a financial transaction with proceeds of an unlawful activity if the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or control of the proceeds of the unlawful activity, or to avoid a transaction reporting requirement under state or federal law.

10.     Pursuant to 18 U.S.C. § 1956(a)(3), it is unlawful to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity: to conceal or disguise the nature, location, source, ownership or control of the property believed to be the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under state or federal law.

11.     Section 1956(h) of Title 18 makes it a crime to conspire to commit a violation of Section 1956(a)(1)(B)(i) or any other subsection of Section 1956.

## BACKGROUND INFORMATION

### U.S. Treasury Department Regulations Governing Money Service Businesses

12.     The following guidance was provided by the Financial Enforcement Crimes Network (FinCEN), a bureau of the United States Department of the Treasury.  I am familiar with FinCEN's guidance, and the information below, from training and from my experience as an investigator.

13.     In 2011, FinCEN issued a final rule ("2011 MSB Final Rule") defining a money services business ("MSB") as, "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within

the United States," operating directly, or through an agent, agency, branch, or office, who functions as, among other things, a "money transmitter."

14.     FinCEN's regulations define the term "money transmitter" to include a "person that provides money transmission services," or "any other person engaged in the transfer of funds."

15.     The term "money transmission services" is defined by FinCEN to mean the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.

16.     The Bank Secrecy Act ("BSA") regulatory framework begins with the expectation that financial institutions will operate under a culture of compliance supported by senior leadership, including owners, boards of directors, and senior executives. This culture of compliance will dictate the basic norms of behavior, knowledge, and transparency under which the management team, employees, and service providers will be held accountable.

17.     The BSA and its implementing regulations require MSBs to develop, implement, and maintain an effective written anti-money laundering program ("AML program") that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities. The AML program must, at a minimum: (a) incorporate policies, procedures and internal controls reasonably designed to assure ongoing compliance (including verifying customer identification, filing reports, creating and retaining records, and responding to law enforcement requests); (b) designate an individual responsible to assure day-to-day compliance with the program and BSA requirements; (c) provide training for appropriate personnel, including training in the detection of suspicious transactions; and, (d) provide for independent review to monitor and maintain an adequate program.

18.     The AML program must be approved by the owner of the financial institution, or by the owner's representative (in the case of a corporation, such representative is the Board of Directors). To assure that an AML compliance program is reasonably designed to meet the

requirements of the BSA, MSBs should structure their programs to be risk-based. According to FinCEN MSBs should assess their individual exposure to the risk of money laundering, terrorism finance, and financial crime based on the composition of customer base, the geographies served, and the financial products and services offered. MSBs must properly manage customer relationships and effectively mitigate risks by implementing controls commensurate with those risks. A well-developed risk assessment is part of sound risk management and assists MSBs in identifying and providing a comprehensive analysis of their individual risk profile.

19.    As part of its risk assessment, an MSB should determine both the identity and the profile of its customers, and MSBs must know enough about their customers to be able to determine the risk level they represent to the institution.

<u>Overview Of A Wire Transfer</u>

20.    Corporate MSBs often contract through numerous agents to provide wire transfer services. (NOTE: The term "wire transfer" is used throughout this affidavit. "Wire transfer" should be understood to be a money transfer through an MSB as opposed to a transfer through a traditional bank). As an example from this investigation, MSB-1 (described later in this affidavit) is a corporate MSB and Rincon serves as one of its local agents.

21.    In the typical transaction, the wire transfer process begins when a customer (sender) enters an authorized MSB agent for the purpose of sending money to a receiver (beneficiary).

22.    For legitimate transactions of over $1,000 using MSB-1, customers are asked for a physical identification, which is uploaded to the MSB-1's customer database to build a customer profile. For much of the period discussed in this affidavit, this customer profile including the image of the customer's ID was accessible to other local agents in MSB-1's customer database to quickly identify and serve repeat customers.

23.    The MSB local agent is either connected to its corporate MSB via a computer terminal or by a direct telephonic connection.

24.    The customer provides his/her own name, address, and telephone number as the

6

sender. Once a customer provides his/her telephone number, if the customer is in MSB-1's database, the customer's profile, including ID, is displayed on the screen for the cashier to identify the customer. The customer also provides the name of the receiver (beneficiary) of the wire transfer, as well as the receiver's city, state, and country.

25.     The customer will provide this information directly to an employee at the MSB agent location for the employee to enter it into the corporate MSB's computer system.

26.     After the information is collected, the sender provides the money to be transferred, including the "send fee," to the MSB agent.

27.     The send fee is the amount that the MSB agent charges the sender to send the wire transfer. Based on my training and experience, I understand that the fee for a wire transfer from the United States to Mexico (where the money in the transactions discussed later in this affidavit is being sent) is often $15 to $25.

28.     The sender is then provided a receipt containing all of the provided information (sender information, recipient information, amount of money being sent, and the send fee) plus the date and time the transfer was sent and a unique transaction number sometimes called an MTCN (Money Transfer Control Number). This MTCN number is supposed to be provided by the customer to the intended beneficiary and is required for the wire transfer to be paid out to the beneficiary in Mexico.

29.     MSB agents must provide the corporate MSB with the cash they have collected from conducting wire transfers for customers. MSB agents generally provide this cash through bank deposits.

30.     According to the BSA and its implementing regulations, MSB local agents that provide money transfer services must obtain and record specific information, and verify customer ID for each money transfer of $3,000 or more, regardless of the method of payment.[1]

31.     Many corporate MSBs, including MSB-1, impose more stringent requirements on

---

[1] *See, e.g.*, Bank Secrecy Act Requirements: A Quick Reference Guide for Money Services Businesses: https://www.fincen.gov/sites/default/files/shared/bsa_quickrefguide.pdf.

their local agents and require local agents to maintain sender information for any transaction above $1,000.

32.     The corporate MSB requires its contracted local agents to follow anti-money laundering corporate policies and state and federal laws and regulations.

## STATEMENT OF PROBABLE CAUSE

33.     The Internal Revenue Service, Criminal Investigation (IRS-CI) and the Drug Enforcement Administration (DEA) began investigating Rincon Musical ("Rincon"), an Oakland, California local agent of Corporate Money Service Business-1 ("MSB-1"), and its employees in 2021 after receiving information from arrested drug traffickers who reported using Rincon to send drug proceeds to their drug suppliers in Mexico.

34.     **FELIPE** is the owner of Rincon Musical, LLC ("Rincon"), a money transmitter business located in Oakland, California.

35.     Veronica Mora (**VERONICA**) and Yoselin K. Perez Ramirez (**YOSELIN**) are cashiers and current employees at Rincon.

36.     Griselda Cancelada Liceaga (**GRISELDA**) was a cashier and employee at Rincon until at least December 2020.  GRISELDA then opened her own money transmitter business— **America Latina** at 1226 Fruitvale Avenue in Oakland, CA.

37.     As detailed below, **FELIPE, GRISELDA, YOSELIN,** and **VERONICA** (collectively, "the defendants") were trained annually on the AML program of the corporate MSB for whom they served as an agent.

38.     Despite annual training, the defendants nonetheless knowingly assisted narcotics traffickers, who did not want their true names and identification documents used on transactions, to launder drug proceeds from the United States to Mexico.

39.     The defendants did this by using legitimate MSB customers' identification cards (ID cards) and personal information, without the authorization of those customers, to conduct wire transfers that would likely have triggered investigation by the Corporate MSB because of

their size.  As discussed herein, for example, when a former narcotics trafficker working under the supervision of agents brought in $20,000 to wire to Mexico, two of the defendants broke down (structured) the $20,000 amount into multiple transactions of less than $3,000 each to avoid scrutiny by MSB-1, because transactions of $3,000 or more are subject to greater scrutiny by corporate MSBs than smaller transactions under the legal requirements of the BSA.  In addition, the defendants would take identity information belonging to third-party victims and send the transactions under those identities rather than the true identity of the drug trafficker.

40.    In exchange for this assistance, the defendants charged extra transaction fees that were not recorded on the MSB's transaction receipts.

### A.    Anti-Money Laundering Training Program Completed by GRISELDA, VERONICA, YOSELIN, and FELIPE

41.    Corporate MSBs generally require their local agents to complete Anti-Money Laundering (AML) Training when they initially become agents and then once annually as long as they provide wire transfer services.

42.    **FELIPE** is the business owner of Rincon, and is responsible for ensuring the ongoing compliance of his business and its employees with all state and federal anti-money laundering laws, MSB-1's internal anti-money laundering policies and procedures, and for ensuring that all employees are trained on anti-money laundering requirements before conducting any money transfer activity, and on an ongoing basis as needed.

43.    Employees at MSB-1's local agents must receive AML Training before they begin processing transactions and annually thereafter.

44.    The topics covered in the AML Training include how to detect suspicious activity, structuring, willful blindness, the definition of money laundering, and red flags indicative of money laundering.

45.    In the AML Training, MSB-1's local agent employees are instructed that it is a violation of AML policies to utilize inaccurate sender information, structure transactions, and to fail to inquire about the source of large amounts of cash.

46.     **GRISELDA**, **VERONICA**, and **YOSELIN** successfully completed MSB-1's AML Training for local agent employees and received certificates of completion. **GRISELDA** completed the AML Training annually from 2017 to 2020 at Rincon and in 2021 at America Latina. **VERONICA** completed the AML Training annually from 2017 through 2021 at Rincon. **YOSELIN** completed the AML Training annually from 2019 through 2021 at Rincon.

47.     **FELIPE** completed the AML Training annually from 2015 through 2021.

48.     The AML Training completed by **GRISELDA**, **VERONICA**, **YOSELIN**, and **FELIPE** informed trainees that: money laundering is the process whereby dirty money–produced through criminal activity–is transformed into clean money, leaving the criminal origin difficult to trace.

49.     Trainees were informed that money is laundered in order to conceal the source of funds that come from criminal activity including drug trafficking that generate large amounts of cash.

50.     For wire transactions up to $999, trainees learned that they were required to obtain (1): the customer's complete name, street address, and telephone number, and (2) the beneficiary's complete name, street address, and city, state, and country.

51.     Trainees also learned that they were required to have a wire receipt signed by the customer and the employee agent conducting the transaction.

52.     For MSB-1 wire transaction up to $999, however, no identification is required to be presented for the transaction to be processed.

53.     For wire transactions of $1,000 or more processed by MSB-1, trainees were instructed that the customer must provide a Government ID (U.S. or foreign), date of birth, and the customer's occupation.

54.     Trainees were also instructed on the requirements that a Money Service Business must follow under the Bank Secrecy Act. Trainees were instructed that MSB-1 local agent employees are required to file a suspicious activity report for suspicious transactions of $2,000 or more.

55.     Trainees also were instructed that if they were asked to process unusual transactions, they should ask "know your customer" questions to learn: (1) the purpose of the transaction, (2) the source of the funds, and (3) the customer's relationship with the beneficiary.

56.     The MSB-1 AML Training also informed trainees that they should be on the lookout for "structuring"—designing a transaction to evade triggering a reporting or recordkeeping requirement. The MSB-1 AML Training informed trainees that structuring is a federal crime and must be reported by filing a suspicious activity report.

57.     The AML Training provided specific examples of structuring, including breaking a large transaction into two or more smaller transactions to avoid reporting requirements.

58.     Trainees were also instructed on "Suspicious Activity Red Flags" (as shown on the slide below) that they should look for in deciding whether to report a suspicious transaction, including when: (1) a customer makes inquiries that would indicate a desire to avoid reporting; (2) a customer consistently makes cash transactions that are just under the reporting threshold amount in an apparent attempt to avoid the reporting threshold; (3) a customer consistently makes cash transactions that are significantly below the reporting threshold amount in an apparent attempt to avoid triggering the identification and reporting requirements; and (4) the stated occupation of the customer is not in keeping with the level or type of activity.



59.     In addition to emphasizing the trainees' obligation to report suspicious transactions they handled, the AML Training showed trainees how to report within the MSB-1 software platform used to process transactions to permit further investigation by MSB-1's compliance team and provided an email address and telephone number that cashiers should use to contact the MSB-1 compliance team.

60.     As discussed below, despite completing the AML Training annually, **GRISELDA**, **VERONICA**, and **YOSELIN** not only failed to report suspicious transactions displaying common red flags, but actively worked to structure suspicious transactions and to circumvent ID requirements to facilitate suspicious transactions on behalf of customers who did not want their names attached to the transactions.

### B.     Drug Trafficker-1 Informs Agents that He Used Rincon to Wire Drug Proceeds to Mexico.

61.     Agents arrested Drug Trafficker-1 for narcotics offenses in December 2020, and Drug Trafficker-1 was charged with drug offenses in federal court.  Agents searched his cellular phone pursuant to a search warrant, and Drug Trafficker-1 also provided information to the government pursuant to a proffer agreement.

62.     Drug Trafficker-1 (who is a Honduran national) told agents that Rincon assisted him with wiring drug proceeds to his drug source of supply (SOS) in Mexico.

63.      Drug Trafficker-1 informed agents that he was often instructed by his SOS to send money back to Mexico and that he used certain "banks," which agents know to be local agent MSBs, to complete the wire transfers.

64.     The local agent MSB Drug Trafficker-1 used most often was Rincon in Oakland.

65.     According to Drug Trafficker-1, the cashiers at Rincon charged him unrecorded "fees" in exchange for agreeing to send multiple wire transactions at once without requiring him to show ID, which agents know is not permitted under the AML local agent MSB policies Rincon is required to follow.

66.     Drug Trafficker-1 generally brought cash to Rincon in a plastic bag, or sometimes in a small cash/money purse.  Due to the amounts of cash he brought, Drug Trafficker-1 reported that the female cashier who assisted him sometimes had to leave her post behind the enclosed counter and receive the cash in person because it would not fit through the teller window.

67.     The female cashier physically opened the door from behind the cashiers' protected, enclosed area and accepted the money from Drug Trafficker-1.  The cashier then put the money through a cash counting machine.

68.     Drug Trafficker-1 often gave the cashier bundles of cash even when he did not yet have the destined recipients' names in Mexico.  In those instances, he would send the cashier the recipient name(s) through WhatsApp afterwards.

69.     Sometimes Drug Trafficker-1 had the recipient(s) information and would send it to the female cashier on WhatsApp before dropping off the cash.  After the cashier had the wire transfers processed, she sent receipts to Drug Trafficker-1 through WhatsApp within a few hours.

70.     Drug Trafficker-1 had contact information for two of the cashiers at Rincon, including their WhatsApp contacts.  He would message one of the cashiers to determine which one of them was working at Rincon when he wanted to wire money.

71.     Agents' analysis of the WhatsApp conversations on Drug Trafficker-1's phone revealed over 60 wire transaction receipts from Rincon; in other words, Drug Trafficker-1 sent over 60 wire transfers to Mexico through Rincon.

72.     The receipts found on Drug Trafficker-1's WhatsApp corroborate the general pattern of interaction that he described with Rincon cashiers from August 2020 to December 2020.  The receipts did not list Drug Trafficker-1 as the sender (i.e. the receipts did not use his true name or ID), did not show the extra fee he was charged by the cashiers, and were sent to him through WhatsApp.

73.     The WhatsApp wire transfer receipts reviewed on Drug Trafficker-1's WhatsApp total over $109,000 during the five-month period between August 2020 and December 2020; in

other words, based on the investigation, agents believe that Drug Trafficker-1 laundered over $109,000 in drug proceeds through Rincon, with the assistance of Rincon tellers, during that period.

      **C.**    **WhatsApp Chats on Drug Trafficker-1's Phone Show Conversations with GRISELDA While She was Working at Rincon**

74.    The WhatsApp on Drug Trafficker-1's phone shows that Drug Trafficker-1 engaged in chat conversations, from November 2020 through December 2020, with the WhatsApp account linked to phone number ▇▇▇▇9206, which agents know to belong to **GRISELDA**.

75.    Agents determined that the WhatsApp profile picture (shown below) for phone number ▇▇▇▇9206 matches **GRISELDA's** driver license's photo.



76.    Agents reviewed the WhatsApp chats between Drug Trafficker-1 and **GRISELDA**. WhatsApp chats typically took place when Drug Trafficker-1 brought money to Rincon but did not yet know who the money should be sent to. In the chat conversations, Drug Trafficker-1 would typically provide the names of persons to whom he wanted to wire the money he had previously brought to Rincon.

77.    **GRISELDA** would respond with photos of wire transaction receipts processed at Rincon. The receipts show as beneficiaries (i.e. recipients) of the wire transactions the persons whose names Drug Trafficker-1 provided in the WhatsApp chat conversation. The receipts also showed which teller conducted the transactions. Some of these receipts show wire transactions that were conducted the same day as the WhatsApp conversation by "Gricelda C," while other receipts appear to be records for wire transactions conducted by another operator, "Yoselin K" (who agents believe to be **YOSELIN**).

78.     Based on my training and experience, I know that money launderers often break large amounts of cash into multiple transactions and may assign transactions between two or more employees to avoid red flags that a corporate MSB would likely detect and investigate.

79.     The wire transaction receipts also listed senders, none of whom were Drug Trafficker-1. Drug Trafficker-1 did not provide sender names to **GRISELDA** in Drug Trafficker-1's WhatsApp chat conversation with her.

80.     Based on my knowledge of the investigation, and as described further below, I believe that the listed senders are unsuspecting third-party customers of MSB-1 whose information **GRISELDA** and other cashiers at Rincon obtained from MSB-1's customer database. **GRISELDA** and other cashiers at Rincon would use the IDs of these unsuspecting third-party customers without the knowledge or authorization of those customers to fraudulently conduct these wire transactions.

81.     For example, the Rincon receipt found on Drug Trafficker-1's phone shown below lists the operator (the teller who conducted the transaction) as "Gricelda C." The recipient of the wire transaction (a recipient name that Drug Trafficker-1 supplied to Rincon in a WhatsApp chat) is listed as a person in Guadalajara, Jalisco, Mexico. The sender name on the



receipt was not a name supplied by Drug Trafficker-1 in the WhatsApp chat but is a real person whose California driver's license image showing an address in Fullerton, California was stored in the customer database of MSB-1.

82.     Based on the investigation, and for reasons described further below, agents believe that the listed senders on these wire transfer receipts are unsuspecting third-party customers of MSB-1 whose information **GRISELDA, VERONICA, YOSELIN**, and other cashiers at Rincon obtained from MSB-1's customer database and used without authorization to fraudulently conduct these wire transactions.

**D.     WhatsApp Account of Drug Trafficker-2 Shows Conversations with VERONICA**

83.     Federal agents arrested Drug Trafficker-2 for drug offenses committed in the San Francisco Bay Area around June 2021.  Drug Trafficker-2 gave consent for agents to search his cellular phone.  Drug Trafficker-2 was also interviewed by agents pursuant to a proffer agreement.

84.     Drug Trafficker-2 told agents that he wired drug proceeds to Mexico at Rincon. He would bring in his drug proceeds in cash to Rincon, and send the cashiers the recipients names through WhatsApp.  Drug Trafficker-2 stated that he went to Rincon based on the knowledge that other narcotics traffickers he knew would go there to send drug proceeds via wire transfers. Drug Trafficker-2 said that he thought Rincon wanted to charge the unrecorded transaction fees he was charged for these transactions and neither cared nor asked if the cash was derived from drug sales.

85.     Agents searched Drug Trafficker-2's cellular phone and discovered: (1) a WhatsApp conversation between Drug Trafficker-2 and ██████-9206, which as noted above agents know is a telephone number which belongs to **GRISELDA**, and (2) a separate WhatsApp conversation between Drug Trafficker-2 and phone number ██████-4392, which agents know belongs to **VERONICA**.

86.     In Drug Trafficker-2's WhatsApp chat conversation with **GRISELDA**, in approximately May 2021, Drug Trafficker-2 sent **GRISELDA** people's names and photos of bank card sent to him with the recipient names for an account in Mexico.  Based on my training and experience and my knowledge of this investigation, Drug Trafficker-2 sent this information to GRISELDA because he wanted her to wire Drug Trafficker-2's money to these individuals.

87.     **GRISELDA** responded with photos of wire transaction receipts.  Some of these receipts show the wire transaction recipients as the people whose names and banking information Drug Trafficker-2 had provided.  The receipts also show that the senders of the wire transactions were not persons whose names Drug Trafficker-2 provided.  In other words, **GRISELDA**, used the identities of other people, not Drug Trafficker-2, to send these wire transactions.

88.     The wire transaction receipts also listed senders, none of whom were Drug Trafficker-2.  Drug Trafficker-2 did not provide the sender names to **GRISELDA** in Drug Trafficker-2's WhatsApp chat conversation with **GRISELDA**.

89.     Based on my knowledge of the investigation, and as described further below, I believe that the listed senders are unsuspecting third-party customers of MSB-1 whose information **GRISELDA** and other cashiers at Rincon obtained from MSB-1's customer database. **GRISELDA** and other cashiers at Rincon would use the IDs of these unsuspecting customers without the knowledge or authorization of those customers to fraudulently conduct these wire transactions for Drug Trafficker-2.

90.     The receipts show that the wire transactions were conducted at Rincon with the "operator" shown on different transaction receipts being "Gricelda C", "Veronica M" and "Yoselin K".

91.     Based on the investigation, and for reasons described further below, agents believe that the listed senders on these wire transfer receipts are unsuspecting third-party customers of MSB-1 whose information **GRISELDA, VERONICA, YOSELIN**, and other cashiers at Rincon obtained from MSB-1's customer database and used without authorization to fraudulently conduct these wire transactions.

92.     Drug Trafficker-2's WhatsApp also showed a chat conversation with

**VERONICA**, whose WhatsApp contact (shown below) Drug Trafficker-2 saved as "Rincon M".

Agents determined that the WhatsApp profile photo seen below matches the driver's license

photo for **VERONICA**. Drug Trafficker-2 also identified VERONICA from her driver's license

photo as a cashier who assisted him at Rincon.



| | |
|---|---|
| Name: | Rincon M |
| Device description: | |
| Source: | WhatsApp |

93.     In Drug Trafficker-2's WhatsApp chat conversation with **VERONICA**, which

took place around May 2021, Drug Trafficker-2 sent names (an example of which is shown in

the text message on the left below) and photos of ID cards and bank cards that had been

previously sent to Drug Trafficker-2 by his SOS with recipient names and accounts in Mexico.




94.     **VERONICA** responded with wire transaction receipts processed at Rincon (an

example of which is shown on the right above).  Multiple wire receipts show "Veronica M" as

the operator on wire transactions sent to people whose names Drug Trafficker-2 provided in his WhatsApp chats to **VERONICA**.

95.     Other receipts showed transactions processed at Rincon by "Gricelda C".

96.     Senders of the wires shown on these receipts were not people whose names or ID cards Drug Trafficker-2 provided in the WhatsApp chat with **VERONICA**.

97.     Based on my knowledge of the investigation, as described further below, I believe that the listed senders are unsuspecting third-party victims whose information **VERONICA, GRISELDA**, and **YOSELIN** used without authorization to fraudulently conduct these wire transactions.

### E.     GRISELDA, VERONICA, and YOSELIN Use An MSB-1 Employee's ID and Personal Information to Conduct Unauthorized Wire Transfers

98.     Transaction Record Analysis Center (TRAC) is a centralized searchable database of financial transactions of global MSBs that provides law enforcement organizations with assistance on wire remitter agents such as Rincon.

99.     Agents reviewed transactions in TRAC for an MSB-1 employee whose California driver's license was used by **GRISELDA, VERONICA,** and **YOSELIN** to send wire transfers of more than $1,000, as summarized in the table below (highlighted in gray and pink).  The table was compiled from TRAC and shows fraudulent transactions by Rincon and America Latina cashiers.  As discussed below, agents learned that the MSB-1 employee did not authorize these transactions.

\\

\\

\\

\\

\\

\\



| Date | Order # | Customer | ID Type/# | Send Agent Name | Beneficiary | Operator | Trans Amt |
|------|---------|----------|-----------|-----------------|-------------|----------|-----------|
| 9/2/2020 | US1938032240 | ■■■ | ■■ | Rincon Musical | ■■■ | GRICELDA CANCELADA | $1,730 00 |
| 6/23/2021 | US1517142560 | ■■■ | ■■ | America Latina | ■■ | GRISELDA CANCELADA LICEAGA | $1,500 00 |
| 6/24/2021 | US387068816 | ■■ | ■■ | America Latina | ■■ | ■■ | $1,500 00 |
| 7/20/2021 | US196180061 | ■■ | ■■ | Rincon Musical | ■■■ | VERONICA MORA | $2,900 00 |
| 8/16/2021 | US939869261 | ■■ | ■■ | Rincon Musical | ■■■ | ■■ | $2,950 00 |
| 8/31/2021 | US1330439461 | ■■■ | ■■ | America Latina | ■■ | ■ | $2,500 00 |
| 9/9/2021 | US1609247761 | ■■ | ■■ | Rincon Musical | ■■ | VERONICA MORA | $2,900 00 |
| 9/13/2021 | US1721856861 | ■■ | ■■ | America Latina | ■■ | GRISELDA CANCELADA LICEAGA | $1,800 00 |
| 10/5/2021 | US235781162 | ■■ | ■■ | America Latina | ■■ | GRISELDA CANCELADA LICEAGA | $2,500 00 |
| 11/3/2021 | US1069723162 | ■■ | ■■ | Rincon Musical | ■■ | Yoselin Karina Perez | $2,850 00 |

100.     As shown in the table, **GRISELDA** used the employee's ID while **GRISELDA** was working at Rincon on September 2, 2020 and then continued to use the victim's ID throughout 2021 at **GRISELDA**'s new business America Latina.

101.     Similarly, as shown in the table, **YOSELIN**, **VERONICA**, and other Rincon employees used the MSB-1 employee's identity information throughout 2021 to process unauthorized wire transfers.

102.     On February 8, 2022, agents interviewed the MSB-1 employee. The  employee said she has not conducted wire transactions in Oakland, California and does not know the local agents Rincon or America Latina in Oakland.

103.     The employee stated that she has not been to Oakland in approximately twelve years.

104.    The employee reviewed a list of wire transactions (shown below in part) and stated that the transactions conducted at Rincon and America Latina (highlighted in gray and pink) were not transactions that she authorized.

| Send Agent Name | Send Agent City | Send DateTime | Amount | Sender Name | Sender DOB | Sender Street | Sender City | Sender State | Sender Phone | Sender ID1 Num |
|---|---|---|---|---|---|---|---|---|---|---|
| ENVIOS Y MAS (SAN DIEGO) | SAN DIEGO | 12/6/16 14:16 | $   836.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 12/23/16 15:44 | $ 2,970.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| PROSPERA GONZALEZ - #31 | SAN DIEGO | 1/23/17 14:19 | $   913.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 1/27/17 12 56 | $ 1,980.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 3/2/17 10 01 | $   500.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 4/8/17 13 58 | $ 2,000.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 4/11/17 10:22 | $ 2,000.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 4/11/17 18:19 | $ 2,000.00 | | /1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 4/15/17 12 50 | $ 2,000.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLIT | SAN DIEGO | 6/2/17 13:37 | $ 1,000.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLIT | SAN DIEGO | 7/11/17 16:39 | $ 1,000.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLIT | SAN DIEGO | 7/24/17 13:46 | $ 1,000.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLIT | SAN DIEGO | 8/1/17 16:32 | $   891.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 8/11/17 15:35 | $ 1,000.00 | | 1970 | | CHULA VISTA | CA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 10/6/17 16 50 | $ 1,000.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| ENVIOS Y NOVEDADES EL FRIJOLITO | SAN DIEGO | 10/30/17 14:29 | $   995.00 | | 1970 | | CHULA VISTA | CA | | |
| LINDA LIQUOR | SAN DIEGO | 12/9/17 15:34 | $   935.00 | | | | CHULA VISTA | CA | | |
| LINDA LIQUOR | SAN DIEGO | 5/25/18 13:19 | $   800.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| LINDA LIQUOR | SAN DIEGO | 5/26/18 8 51 | $   800.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| LINDA LIQUOR | SAN DIEGO | 6/19/18 13:29 | $   654.00 | | 1970 | | CHULA VISTA | CALIFORNIA | | |
| RINCON MUSICAL | OAKLAND | 9/2/20 14:09 | $ 1,730.00 | | 1970 | 45TH AVE | OAKLAND | CALIFORNIA | | |
| AMERICA LATINA | OAKLAND | 6/23/21 16:28 | $ 1,500.00 | | 1970 | 85TH AVE | OAKLAND | CALIFORNIA | | |
| AMERICA LATINA | OAKLAND | 6/24/21 14 07 | $ 1,500.00 | | 1970 | 85TH AVE | OAKLAND | CALIFORNIA | | |
| RINCON MUSICAL | OAKLAND | 7/20/21 14:15 | $ 2,900.00 | | 1970 | 45TH AVE | OAKLAND | CALIFORNIA | | |
| RINCON MUSICAL | OAKLAND | 8/16/21 16:14 | $ 2,950.00 | | 1970 | 45TH AVE | OAKLAND | CALIFORNIA | | |
| AMERICA LATINA | OAKLAND | 8/31/21 13:32 | $ 2,500.00 | | 1970 | 85TH AVE | OAKLAND | CALIFORNIA | | |
| RINCON MUSICAL | OAKLAND | 9/9/21 17 09 | $ 2,900.00 | | 1970 | 45TH AVE | OAKLAND | CALIFORNIA | | |
| AMERICA LATINA | OAKLAND | 9/13/21 13:40 | $ 1,800.00 | | 1970 | 85TH AVE | OAKLAND | CALIFORNIA | | |
| AMERICA LATINA | OAKLAND | 10/5/21 13 52 | $ 2,500.00 | | 1970 | 85TH AVE | OAKLAND | CALIFORNIA | | |
| RINCON MUSICAL | OAKLAND | 11/3/21 17:39 | $ 2,850.00 | | 1970 | 45TH AVE | OAKLAND | CALIFORNIA | | |

105.    According to the employee, the wires in the table sent from San Diego locations before September 2, 2020 were transactions she authorized and show her name, her correct address, her correct phone number, and beneficiaries who are her family or friends in Mexico.

106.    According to the employee, the wires in the table sent from Oakland from September 2, 2020 through November 3, 2021 were not transactions that the employee authorized and list beneficiaries the victim employee does not know.

107.    The Oakland transactions did not use the employee's correct phone number or her correct address, except in one instance on October 5, 2021 when an incorrect address was used but the employee's actual phone number was also used.

108.    The TRAC database shows that the Oakland transactions were conducted by Rincon cashiers **GRISELDA**, **VERONICA**, **YOSELIN**, as well as other Rincon employees.

109.    The Oakland transactions used a falsified address and falsified telephone number for these unauthorized transactions — not the real address and telephone number of the victim employee that is listed in MSB-1's customer database.

110.    According to the employee, sometime between September 13, 2021 and October 5, 2021, she became aware that wire transactions she had not authorized were being processed using her identity information. She reported this to her supervisor at MSB-1.

111.    Based on my knowledge of the investigation and my training and experience, I believe that **GRISELDA**, **VERONICA**, and **YOSELIN** used the MSB-1 employee's driver's license without authorization to fraudulently conduct these wire transactions.  I further believe that they did this to conceal the real identity of the sender, which is consistent with their pattern of behavior when sending drug proceeds on behalf of Drug Trafficker-1, Drug Trafficker-2, and the undercover agent in the controlled transactions discussed below.

**F.    Corporate MSB-2 Investigates Rincon**

112.    In January 2022, federal agents spoke with the Compliance Officer at MSB-2.

113.    The Compliance Officer reported that Rincon started using MSB-2's wire services in December 2021, and that MSB-2 quickly grew suspicious of Rincon due to the high volume of transactions for a new local agent and the higher-than-average dollar amounts Rincon wired to Mexico.

114.    According to the Compliance Officer, MSB-2 started an internal investigation and determined that Rincon was submitting fake phone numbers and fake IDs to satisfy MSB-2's reporting requirements.

115.    MSB-2 took a sample of Rincon's transactions and attempted to call the numbers listed for the senders of transactions that MSB-2 believed were sent with fake IDs.  MSB-2 was unable to reach any customers: some numbers went to voicemail, some were disconnected, and, at other numbers, there was no answer at all.

116.    MSB-2 concluded that the IDs Rincon was submitting were fake based on the way they looked because, for example, the corners were squared and they looked to the MSB-2 compliance team to be fake.

117.    MSB-2 provided examples of the type of IDs that appeared to be altered as show in the image below.



118.    MSB-2 concluded that Rincon was complicit in the suspicious activity of using fake IDs to facilitate large wire transactions to Mexico and terminated Rincon as a local agent.

**G.    Agents Use Undercover Visits to Confirm the Reported Pattern of Rincon Employees Fraudulently Using Identity Information to Launder Drug Proceeds**

119.    As part of the government's investigation, agents utilized two confidential sources, CW1[2] and CW2[3], to conduct multiple transactions at Rincon. Cashiers at Rincon

---

[2]  Since 2016, CW1 has provided information and assistance to the DEA and other federal, state and local law enforcement agencies in California, resulting in arrests and seizures of drugs and drug proceeds.  CW1 has a DUI but no other criminal record.  CW1 has made recordings of the visits to Rincon. Based on the investigation to date, agents believe that the information provided by CW1 has been reliable. CW-1 is seeking United States citizenship under the S-Visa program.

[3]  CW2 has pleaded guilty to a felony in a pending federal drug case and is cooperating prior to sentencing.  Agents believe CW2 is present in the United States without authorization. CW2 has a misdemeanor conviction for driving without a license, and at least five arrests, including for drug possession and drug-related financial offenses. CW2 has had recorded phone conversations with Rincon employees and has made recordings of visits to Rincon and America Latina. The government has confirmed the content of CW2 visits to Rincon and America Latina by reviewing the recordings that were made of those visits.  Separately, the government learned
*(footnote cont'd on next page)*

assisted CW1 and CW2, who said they did not want their true names and identification documents used on transactions, in wiring large amounts of cash through Rincon from the United States to Mexico.  The cashiers structured the large cash amounts into multiple transactions of under $3,000, to circumvent to AML reporting requirements and used legitimate MSB customers' identification cards (ID cards) and personal information, without the authorization of those customers, to satisfy MSB-1's ID requirements for the wire transfers.   All visits to Rincon and conversations with Rincon employees by CW1 and CW-2 were recorded.

### a.    *Covert operation on January 10, 2022 at Rincon*

120.    On or around January 10, 2022, federal agents sent CW1 to conduct a transaction at Rincon.  CW1 went into Rincon, approached a cashier, and inquired about wire transactions.

121.    CW1 indicated that he was there to send a wire transaction on behalf of his "boss" and spoke directly with the cashier.  CW1 told the cashier that he did not want to send money using his true name. The cashier let him send the wire under a fake name.

122.    The cashier sent a $950 wire to Mexico for CW1 under a fake name CW1 provided without showing identification.

123.    Based on my knowledge of this investigation and my training and experience, I believe the cashier allowed CW1 to wire money to Mexico using a fake name.

\\

\\

\\

\\

---

that CW2 was in contact with the target of another drug investigation during his cooperation. When questioned by agents, CW2 reported that he has known the drug target for approximately fourteen years and that he met with the drug target recently at a park. CW2 stated he did not believe that they had spoken on the phone for months; however, phone records showed that the phone agents believe belongs to the target has been in contact with CW2's phone approximately eight times in the preceding months. While the government is uncertain whether these phone conversations with CW2's friend were social or drug-related, the information obtained from CW2's visits to Rincon and America Latina has been corroborated by CW2 wearing a recording device and making recordings of the visits, agent surveillance of CW2's undercover visits, and pre-visit and post-visit searches of CW2's person.

*b.*    ***Covert operation on January 11, 2022 with VERONICA***

124.    The next day on January 11, 2022, CW1 tried to send a second wire transaction at Rincon.  Cashiers told CW1 that he needed ID because he sent money the previous day.

125.    CW1 went to **VERONICA's** window.  During the meeting **VERONICA** was having a side discussion with another Rincon employee about CW1's transaction.

126.    When CW1 said he did not want to use his name or show ID, he was asked the following at different times throughout the conversation:

- "Who sent you?"
- "What's his name?"
- "Do you have a picture of him?"
- "…On WhatsApp."
- "He comes here and does wire transfers?"
- "But does your friend send to Mexico?"
- "Let's see… And does your friend not have a cellular number?"
- "Yes, ask him, just if he could- has a number"
- "Just ask him if he has any-…a number for either -one of us."
- "You don't even have a picture of him?"
- "What is your friend's name, the one that referred you here?"
- "Ask your friend how he did it to send money from here to Mexico. And that is all that you are going to ask him."
- "And then when you come here…. you are going to tell them…"

108.    Ultimately, **VERONICA** recommended that CW1 show a WhatsApp profile picture of his boss the next time.

109.    CW1 provided his name but said that CW1 did not want to send the money using CW1's true name or any record that CW1 had sent anything.

110.    **VERONICA** allowed CW1 to send the wire without using CW1's real name.

Veronica told CW1 she was going to send the wire through another corporate MSB because CW1 had sent money the previous day.

111. **VERONICA** also told CW1, "So that you're not asked to provide ID you have to send less than one thousand ($1,000) dollars but that is per month."

112. Based on my knowledge of this investigation and my training and experience, I believe that VERONICA's statement shows her knowledge of corporate MSB-1's ID verification requirement for customer transactions of more than $1,000.

113. Rincon ultimately processed CW1's wire transaction to Mexico that day through MSB-2 — a second corporate MSB used by Rincon.

114. Based on my knowledge of the investigation and my training and experience, I believe that **VERONICA** processed the transaction through MSB-2 because processing it through MSB-1 would have violated MSB-1's AML policy requiring employees of a local agent to obtain a non-expired government issued ID for transactions totaling $1,000 or more per month given that CW1 was sending over $1,000 and had wired $950 the previous day and did not want to provide ID.

c. ***Covert Operation on February 10, 2022 with YOSELIN***

115. On or about February 10, 2022, a second confidential source (CW2) visited Rincon at the direction of agents and under their supervision.

116. CW2 went into Rincon, approached a cashier window and spoke to **YOSELIN** about wiring approximately $9,000 to four people in Mexico.

117. CW2 told **YOSELIN** that he did not have an identification card (ID card) on hand because his wallet was stolen and that he had conducted other wire transactions with another store nearby.

118. **YOSELIN** asked for the wire recipients' names, cities, and states in Mexico.

119. **YOSELIN** told CW2 it would take her an hour to complete the wires and she asked, "Do you have the names?" and added "Give them to me through WhatsApp, alright?"

CW2 responded, "Uh, I don't have WhatsApp. Right now…"  CW2 told **YOSELIN** she could text CW2 photos of the receipts.

120.    **YOSELIN** told CW2 that she would send photos of the wire receipts to him by text later.  CW2 provided **YOSELIN** with his phone number.

121.    Later that day, **YOSELIN** sent CW2 four text messages.  The text messages had photos of wire receipts documenting four transactions: one processed by "Yoselin K," and the other three processed by an unidentified Rincon operator.

122.    The wire transactions shown on the receipts were for approximately $2,275, $1,900, $2,275, and $2,335 — totaling $8,785.

123.    **YOSELIN** charged CW2 a recorded wire transaction fee of $95 and an additional unrecorded fee of $120 for all four wire transactions.

124.    The receipts list the wire recipients as the four people whose names CW2 provided to **YOSELIN**.

125.    The senders shown on the receipts are third parties people whose names CW2 did not provide.  Neither CW2 nor Yoselin are listed as the senders.

126.    To process the wires through MSB-1, Rincon submitted IDs correlating with the third-party sender names used. These IDs were not provided by CW2.

127.    Based on my knowledge of this investigation and on my training and experience, I know that charging unrecorded fees for wire transaction violates the AML policies of corporate MSBs and is indicative of a suspicious transaction. I further know that charging unrecorded fees is a sign that an employee knows that the transaction displays red flags that should trigger further inquiry and should be reported to the corporate MSB for scrutiny. In this instance, I believe that **YOSELIN** structured a transaction of over $3,000 into four separate transactions of less than $3,000. **YOSELIN** did not verify the sender's ID and intentionally did not record the correct sender information for the transactions.

128.    Based on agents' training and experience, I believe that the senders are third-party victims whose information **YOSELIN** obtained from the customer database of MSB-1 and used

to conduct fraudulent wire transactions without authorization.  Each of the wires contained names, addresses, and identification not associated with CW2.

> ### d.    Covert operation on February 17, 2022 at Rincon with YOSELIN

129.    On February 17, 2022, CW2 visited Rincon at the direction of agents and under their supervision.

130.    CW2 went into Rincon, approached a teller window, and spoke to **YOSELIN** about wiring approximately $9,000 to four people in Mexico.

131.    CW2 gave **YOSELIN** a piece of paper with the four recipients' names, cities, and states in Mexico.

132.    **YOSELIN** processed four wire transactions in the amounts of $2,450, $2,150, $2,300, and $2,300.

133.    **YOSELIN** charged CW2 a recorded wire transaction fee and an additional unrecorded fee for the wire transactions.

134.    **YOSELIN** asked CW2 for his first name and telephone number so that she could text CW2 the receipts afterward.

135.    Later that day, **YOSELIN** texted CW2 four receipts to CW2.  Two of the receipts showed wires processed by "Yoselin K.," and two of the receipts showed wires processed by "Veronica M."  The receipts listed the wire recipients as the four people whose names CW2 had provided as the recipients for the wire transfers.

136.    The wire transactions used as supporting sender ID documents three Mexican Consular ID Cards and a California ID Card with an address in Delano, CA that CW2 did not provide to **YOSELIN**. The receipts showed the listed senders to be people other than CW2, **YOSELIN**, or the recipient names provided by CW2.  CW2 did not provide the sender names.

137.    The table pictured below shows the transactions that **YOSELIN** and

**VERONICA** processed for CW2 on February 17, 2022.

| fEnteredTime | Enter Time | fBenState | FIDNO | fOrderNo | Sender Full Name | Beneficiary Full Name | Paying Agent | Entered By | Total |
|---|---|---|---|---|---|---|---|---|---|
| 02/17/22 | 5:43:54 | SON | | US452289879 | | | Elektra del Milenio S.A. De C.V. | Yoselin Karina Perez | $2,475.00 |
| 02/17/22 | 5:46:52 | MICH | | US452322479 | | | Elektra del Milenio S.A. De C.V. | Veronica Mora | $2,325.00 |
| 02/17/22 | 5:54:37 | JAL | | US452406079 | | | Elektra del Milenio S.A. De C.V. | Veronica Mora | $2,325.00 |
| 02/17/22 | 5:55:55 | JAL | | US452418779 | | | Elektra del Milenio S.A. De C.V. | Yoselin Karina Perez | $2,175.00 |

138.    Agents obtained images from MSB-1's business records (shown below) of the

IDs that Rincon used to satisfy the identity verification requirements for CW2's final two

transactions in the table above.



139.    Neither of the people whose IDs were used in these two wire transfers is CW2.

140.    The Oakland customer addresses listed on the wire receipt for the transactions do

not match the Central Valley (Tustin, CA) and Southern California (Delano, CA) addresses

shown on the women's ID cards.

141.    The customer signatures shown on the wire receipts do not match the women's

signatures shown on the ID cards.

142.    MSB-1's business records show that **VERONICA** and **YOSELIN's** login credentials for MSB-1's system were used to conduct these two transactions as shown in the images below.



143.    The Rincon employees entered a modified address and telephone number for these unauthorized transactions — not the real address and telephone number of the sender that was previously used by the sender to conduct authorized wires.

144.    Based on my knowledge of the investigation and my training and experience, I believe that the listed senders are third-party victims whose information **YOSELIN** and **VERONICA** used to conduct fraudulent wire transactions without their authorization because each of the wires were in names, addresses, and IDs that do not belong to CW2.

145.    Based on my knowledge of this investigation and on my training and experience, I know that charging unrecorded fees for wire transaction violates the AML policies of corporate MSB-1.  I further know that charging unrecorded fees is a sign that an employee knows that the transaction displays red flags that should trigger further inquiry and should be reported for scrutiny. In this instance, I believe that **YOSELIN** and **VERONICA** structured a transaction of over $3,000 into four separate transactions of less than $3,000 to evade reporting requirements. **YOSELIN** did not verify the sender's ID and intentionally did not record the correct sender information for the transactions.

### e.    *CW2 Makes a Recorded Call to YOSELIN on April 20, 2022*

146.    On April 20, 2022, CW2 called **YOSELIN** at the direction of agents and under their supervision.

147.    CW2 told **YOSELIN** he wanted to wire $20,000 to Culiacan, Mexico the following day.  CW2 said: "I will go tomorrow . . . because, uhm, right now, right now I'm here in Los Angeles, I came here to pick up some things."

148.    **YOSELIN** asked, "But is everything for Culiacan?" CW2 responded, "No, no-no-no…uh…I believe, later on, later on tomorrow they are going to give me the…the-the other names . . . they're going to give me the-the names and to what city I have to send it to."

149.    **YOSELIN** responded, "Okay. That's fine."

150.    Based on my knowledge of this investigation and my training and experience, I believe that CW2 is telling **YOSELIN** he is picking up narcotics or narcotics proceeds that he needs to wire drug proceeds to Mexico.  I know from my training and experience that Culiacan is known as a high-risk drug trafficking area in Mexico. I further believe that CW2 is telling **YOSELIN** that he wants to wire $20,000 in cash to Mexico but first needs to get the names of the recipients from someone else prior to coming to Rincon.

### f.    *CW2 Visits Rincon on April 21, 2022 and Transacts with YOSELIN*

151.    On April 21, 2022, CW2 visited Rincon at the direction of federal agents and under their supervision.  CW2 went into Rincon, approached **YOSELIN's** window, and spoke to her about wiring approximately $20,000 to eight people in Mexico.

152.    CW2 took in $22,000 in cash in a brown paper bag inside of a plastic bag.  The $22,000 consisted of $17,000 in $20 bills and $5,000 in $100 bills bundled in $1,000 increments.

153.    CW2 gave **YOSELIN** a piece of paper with the eight recipients' names, cities, and states in Mexico.

154.    **YOSELIN** processed eight wire transactions in the amounts of $2,500, $2,500, $2,500, $2,600, $2,300, $2,500, $2,600, $2,500, totaling $20,000 in cash.

31

155.    **YOSELIN** charged CW2 a recorded wire remittance fee and an additional unrecorded fee for each wire transaction.

156.    **YOSELIN** asked CW2 for CW2's first name and telephone number so that she could text CW2 the receipts later.

157.    Later that evening, CW2 received six wire receipts from YOSELIN. CW2 received two wire receipts the next morning. Four of the wire transactions were processed by "Yoselin K". Four of the wire transactions were processed by "Veronica M."

158.    The receipts listed the wire recipients as the eight people whose names and information CW2 had provided.

159.    The receipts showed the alleged senders to be people other than CW2, **YOSELIN**, or the recipient names provided by CW2.

160.    CW2 did not provide the sender names.

161.    **YOSELIN** and **VERONICA** used six California Driver's Licenses and two Mexican Consular ID Cards that were not provided by CW2 to satisfy the ID requirements for the wires.

162.    **YOSELIN** and **VERONICA** entered a modified address and telephone number for these unauthorized transactions — not the real address and telephone number of the sender that was previously used by the sender to conduct wires.

\\

\\

\\

\\

\\

\\

\\

\\

\\

163.    The table below shows the wires sent by **YOSELIN** and **VERONICA** as well as the ID Type and ID number used in MSB-1's system.

| Order # | Date | Operator | Customer | Beneficiary | Pay City, ST | Trans Amt | fee | Total | ID Type | ID Number |
|---------|------|----------|----------|-------------|--------------|-----------|-----|-------|---------|-----------|
| US125931895 | 4/21/2022 | Yoselin K | ■ | ■ | Tequila, Jalisco, MX | $ 2,500 00 | $ 25 00 | $ 2,525 00 | Matricula Consular of Mexico | |
| US126130195 | 4/21/2022 | Yoselin K | ■ | ■ | Pabellon, Zacatecas, MX | $ 2,500 00 | $ 25 00 | $ 2,525 00 | CA Driver's License | ■ |
| US126168195 | 4/21/2022 | Veronica M | ■ | ■ | Pabellon, Zacatecas, MX | $ 2,500 00 | $ 25 00 | $ 2,525 00 | CA Driver's License | |
| US126187995 | 4/21/2022 | Yoselin K | ■ | ■ | Miguel Hidalgo, Distrito Federal, MX | $ 2,600 00 | $ 30 00 | $ 2,630 00 | Matricula Consular of Mexico | ■ |
| US126302495 | 4/21/2022 | Yoselin K | ■ | ■ | Miguel Hidalgo, Distrito Federal, MX | $ 2,300 00 | $ 25 00 | $ 2,325 00 | CA Driver's License | ■ |
| US126240095 | 4/21/2022 | Veronica M | ■ | ■ | Panuco, Veracruz, MX | $ 2,500 00 | $ 25 00 | $ 2,525 00 | CA Driver's License | ■ |
| US141005995 | 4/22/2022 | Veronica M | ■ | ■ | Apango, Jalisco, MX | $ 2,600 00 | $ 30 00 | $ 2,630 00 | CA Driver's License | ■ |
| US141400495 | 4/22/2022 | Veronica M | ■ | ■ | Apamila, Jalisco, MX | $ 2,500 00 | $ 25 00 | $ 2,525 00 | CA Driver's License | ■ |
| | | | | Total | | $20,000 00 | $ 210 00 | $20,210 00 | | |
| | | | | Extra Fee | | | | $ 510 00 | | |
| | | | | Total with Fees | | $20,000 00 | $ 210 00 | $20,720 00 | | |

164.    Based on my knowledge of this investigation and on my training and experience, I know that charging unrecorded fees for wire transaction violates the AML policies of corporate MSB-1.  I further know that charging unrecorded fees is a sign that an employee knows that the transaction displays red flags that should trigger further inquiry and should be reported for scrutiny. In this instance, I believe that **YOSELIN** and **VERONICA** structured a transaction of over $3,000 into four separate transactions of less than $3,000 to evade reporting requirements and to avoid triggering scrutiny from MSB-1. **YOSELIN** did not verify the sender's ID and intentionally did not record the correct sender information for the transactions.

### g.    *Covert Operation on May 19, 2022 at Rincon*

165.    On May 19, 2022, CW2 visited Rincon at the direction of agents and under their supervision.  CW2 went into Rincon, approached **YOSELIN**'s window, and spoke to her about wiring approximately $18,000 to be sent to five people in Mexico and two people in the United States.

166.    CW2 took in $18,000 in cash in a brown paper bag, inside a plastic bag.  The $18,000 consisted of $14,000 in $20 bills and $4,000 in $100 bills bundled in $1,000 increments (pictured below).



167.    CW2 gave **YOSELIN** a piece of paper with the seven recipients' names, cities, and with five states in Mexico and two U.S. states.

168.    During the meeting, **YOSELIN** asked CW2, "All the way from where?" CW2 responded: "From San Diego, and there was so much traffic."

169.    **YOSELIN** processed seven wire transactions in the amounts of  $2,000, $2,500, $2,700, $2,700, $2,500, $2,500, $2,500, totaling $17,400 in cash.

170.    **YOSELIN** charged CW2 a recorded wire transaction fee and an additional unrecorded fee for each wire transaction.  **YOSELIN** told CW2 the wires would take a while and that she would text CW2 the receipts.

171.    **YOSELIN** sent CW2 three wire receipts that evening and four wire receipts the following morning documenting the wire transactions. Three wire transactions were processed by "Yoselin K.  Four wire transactions were processed by "Veronica M".

172.    The table below depicts the wires send by **YOSELIN** and **VERONICA** as well as the ID Type and ID number used in MSB-1's system:

| Date | Operator | Sender | Tel # | Beneficiary | Pay City, ST | Trans Amt | fee | Total | ID Type | ID Numbe |
|------|----------|--------|-------|-------------|--------------|-----------|-----|-------|---------|----------|
| 5/19/2022 | Veronica M | ▮ | ▮ | | Distrito Federal, Distrito Federal, MX | $ 2,000 00 | $ 20 00 | $ 2,020 00 | Matricula Consular of Mexico | ▮ |
| 5/19/2022 | Yoselin K | ▮ | ▮ | ▮ | Apango, Jalisco, MX | $ 2,500 00 | $ 25 00 | $ 2,525 00 | CA Driver's License | ▮ |
| 5/19/2022 | Veronica M | ▮ | ▮ | ▮ | Tepactzinc, Puebla, MX | $ 2,700 00 | $ 30 00 | $ 2,730 00 | CA ID | ▮ |
| 5/20/2022 | Veronica M | ▮ | ▮ | ▮ | Tapachula, Chiapas, Mexico | $ 2,700 00 | $ 30 00 | $ 2,730 00 | Matricula Consular of Mexico | ▮ |
| 5/20/2022 | Yoselin K | ▮ | ▮ | ▮ | Chiapas, Chiapas, Mexico | $ 2,500 00 | $ 25 00 | $ 2,525 00 | CA Driver's License | ▮ |
| 5/20/2022 | Yoselin K | ▮ | ▮ | | El Paso, Texas, United States | $ 2,500 00 | $ 18 00 | $ 2,518 00 | IRS-UCA | |
| 5/20/2022 | Veronica M | ▮ | | | Tucson, Arizona, United States | $ 2,500 00 | $ 18 00 | $ 2,518 00 | IRS-UCA | |
| | | | | | | $17,400 00 | $ 166 00 | $17,566 00 | | |
| | | | | | Extra Fee | | | $    414 00 | | |
| | | | | | Total with Fees | **$17,400.00** | **$ 166.00** | **$17,980.00** | | |

173.    The receipts show the wire recipients as the seven people whose names CW2 provided

174.    The receipts showed the supposed senders to be people other than CW2, **YOSELIN**, or the recipient names provided by CW2.  CW2 did not provide the sender names.

175.    **YOSELIN** and **VERONICA** used six California Driver's Licenses/ID and two Mexican Consular ID Cards that were not provided by CW2.

176.    **YOSELIN** and **VERONICA** used an incorrect address and telephone number for these unauthorized transactions — not the real address and telephone number of the sender that was previously used by the sender to conduct authorized wires.

177.    Based on my knowledge of this investigation and on my training and experience, I know that charging unrecorded fees for wire transaction violates the AML policies of corporate MSB-1.  I further know that charging unrecorded fees is a sign that an employee knows that the transaction displays red flags that should trigger further inquiry and should be reported for scrutiny. In this instance, I believe that **YOSELIN** and **VERONICA** structured a transaction of over $3,000 into four separate transactions of less than $3,000 to evade reporting requirements and to avoid triggering scrutiny from MSB-1. **YOSELIN** did not verify the sender's ID and intentionally did not record the correct sender information for the transactions.

178.    Based on my knowledge of this investigation and my training and experience, I believe that the listed senders are third-party victims whose information **YOSELIN** and **VERONICA** used to conduct fraudulent wire transactions without their authorization because each of the wires were in names, addresses, and IDs that do not belong to CW2.

h.    *Recorded Call on with YOSELIN and VERONICA on June 15, 2022*

179.    On June 15, 2022, CW2 called **YOSELIN**. During the call, **YOSELIN** told CW2 "we can only send twenty thousand (20,000) at the most per day."

180.    Based on my knowledge of this investigation and my training and experience, I believe that **YOSELIN** is telling CW2 she can accept up to $20,000 in cash for him a day and wire no more than $20,000 a day for him.

i.    *Covert Operation on June 16, 2022*

181.    On June 16, 2022, CW2 visited Rincon at the direction of agents and under their supervision.  CW2 went into Rincon and approached a female cashier at the window.

182.    CW2 conducted wire transactions totaling $12,170 to five people in Mexico.

183.    CW2 took in $13,300 in cash in a brown paper bag, inside a plastic bag.  The $13,300 consisted of $13,300 in $20 bills bundled in $1,000 increments.

184.    **FELIPE** was present at the store during CW2's visit and present at the neighboring window while CW2 was conducting the transactions and while the cashiers were counting the large amount of cash that CW2 gave them.

185.    CW2 told the female cashier, "…I've come to send some money. I had already talked with Yoselin yesterday."  The cashier said, " Yoselin, oh. yes!" and "You are bringing the money?"

186.    CW2 gave the cashier a piece of paper with five recipient's names, city, and state and the $12,300 in cash.

187.    The cashier processed five wires to Mexico for $2,275, $2,750, $2,475, $2,175,

$2,495, totaling $12,170 in cash.

188.    The cashier charged an extra $225 total for the five wires, in addition to the normal wire transaction fee of $130 total remittance fee for the five wires.

189.    The cashier texted CW2 five wire receipts that evening.  The wires were conducted through MSB-1's system.  The senders were each in a name other than CW2's name.

190.    At the end of the meeting, the cashier asked for CW2's name and telephone number to text the CW2 the receipts later.  CW2 gave the cashier his first name and his number, but the cashier did not use his name or telephone number on any of the wires.

191.    The IDs associated with the sender names used on the wires that were not provided by CW2.

192.    The CS was in Rincon for approximately five minutes to send $12,170 in wires to Mexico.

193.    Based on my knowledge of this investigation and on my training and experience, I know that charging unrecorded fees for wire transaction violates the AML policies of corporate MSB-1.  I further know that charging unrecorded fees is a sign that an employee knows that the transaction displays red flags that should trigger further inquiry and should be reported for scrutiny. In this instance, I believe Rincon employees structured a transaction of over $3,000 into four separate transactions of less than $3,000 to evade reporting requirements and to avoid triggering scrutiny from MSB-1.  The cashier did not verify the sender's ID and intentionally did not record the correct sender information for the transactions.

194.    Based on my knowledge of this investigation and my training and experience, I believe that the listed senders are third-party victims whose information Rincon employees used to conduct fraudulent wire transactions without their authorization because each of the wires used names, addresses, and IDs that do not belong to CW2.

\\

\\

**H.    FELIPE, YOSELIN, and VERONICA Give Recorded Statements on August 31, 2022**

195.    On August 31, 2022, **FELIPE**, **YOSELIN**, and **VERONICA** spoke with federal agents after being advised of their *Miranda* rights.

196.    **FELIPE** verbally confirmed that he knew his employees were laundering money that came from drug traffickers.  **FELIPE** also told agents: "I knew that there were things that were going on that were bad."[4]

197.    **FELIPE** confirmed that he taught **YOSELIN, VERONICA**, **GRISELDA** and other Rincon employees how to use the MSB-1 money service business software platform and how to look for IDs in the MSB-1 customer database.

198.    **FELIPE** said that he also taught **GRISELDA** how to use to the MSB-1 computer system and to find customer IDs on the MSB-1 computer system.

199.    **YOSELIN** told agents that before processing large transactions for customers who did not show ID, she called **FELIPE** and obtained his approval.

200.    **YOSELIN** and **VERONICA** told agents that they charged $30 for each transaction in which a customer did not show an ID and that **FELIPE** kept half of those fees.

**I.    Agent Conclusions about Identity Theft Pattern in Wire Transactions**

201.    Based on the evidence gathered in the investigation and on agents' training and experience, federal agents have reached the following conclusions about the pattern of identity theft apparent in large numbers of transactions that have been analyzed at Rincon and America Latina.

202.    **GRISELDA, VERONICA,** and **YOSELIN** conducted multiple wire transactions with the same senders' names and driver's licenses without authorization.

203.    **GRISELDA, VERONICA,** and **YOSELIN** entered false addresses and

---

[4] These statements are based on the simultaneous translations I received during the recorded interviews of **FELIPE**, **VERONICA**, and **YOSELIN**.

telephone numbers for unauthorized transactions — rather than the real address and telephone number that was previously used by the sender to conduct authorized wire transactions so that the legitimate customers would not be notified of the transactions.

204.    Agents believe that the listed senders are third-party victims whose information **GRISELDA, VERONICA,** and **YOSELIN** used to conduct fraudulent wire transactions without the victims' authorization because the wires used names, addresses, and identification that CW1, CW2,  Drug Trafficker-1 and Drug Trafficker-2 did not provide to them.

205.    To process the wires through MSB-1's wire system, **GRISELDA, VERONICA,** and **YOSELIN** submitted photos of IDs correlating with sender names of previous customers of MSB-1 that they obtained from MSB-1's customer database.

## J.    Agent Conclusions about Money Laundering

206.    Based on the evidence gathered in the investigation and on agents' training and experience, federal agents have reached the following conclusion about the money laundering transactions that have been analyzed at Rincon and America Latina.

207.    **GRISELDA**, **VERONICA**, and **YOSELIN** accepted cash proceeds that they knew were derived from narcotics trafficking from Drug Trafficker-1 and Drug Trafficker-2, and that **VERONICA** and **YOSELIN** believed were derived from narcotics trafficking from CW-1 and CW-2, to conduct fraudulent wire transactions to conceal the source and nature of drug proceeds while wiring the funds to Mexico.

## CONCLUSION

208.    Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that **Felipe Jesus Ornelas Mora** has violated 18 U.S.C. § 1956(h), conspiracy to launder monetary instruments. The defendants conspired to launder narcotics proceeds from the United States to Mexico by structuring suspicious transactions to avoid common red flags that would have triggered scrutiny by MSB-1's compliance team.  The

defendants further facilitated the laundering of monetary instruments by fraudulently using the identities of legitimate customers of MSB-1 as the senders on suspicious transactions for customers bringing in large amounts of cash who did not want their true names associated with the transactions.

_____
/s/ Lisa Sasso
_____
Lisa Sasso
Special Agent
Internal Revenue Service – Criminal Investigations

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this ___31st___ day of August 2022.

_____
HON. KANDIS A. WESTMORE
United States Magistrate Judge